UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ROCHELLE TOLBERT ) | |
| ) | No. 14 C 8142 |
| Plaintiff, ) | |
| ) | |
| v. ) | Judge Thomas M. Durkin |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**MEMORANDUM OPINION AND ORDER**

Rochelle Tolbert brings this action for judicial review of the decision of the Commissioner of Social Security denying her claim for disability insurance benefits ("DIB") and social security income ("SSI"). Ms. Tolbert moved this Court for summary judgment. R. 16. In lieu of a response, the Commissioner filed a motion for remand, conceding errors in the decision of the Administrative Law Judge ("ALJ"). R. 30 at 1. The Commissioner's motion for remand is granted in part in that the case will return to the Social Security Administration for final disposition; Ms. Tolbert's motion for summary judgment is also granted in part in that the remand order is with instructions to calculate and award benefits to Ms. Tolbert retroactive to April 1, 2005. The Court's reasoning is set forth below.

**Background**

This is the second appeal of this case to the district court. The opinion on the first appeal, decided by Judge Mason in 2012, sets forth in extensive detail the

medical history relevant to this case. *See Tolbert v. Astrue*, 2012 WL 1245611 at *1-8 (N.D. Ill. Apr. 13, 2012) (remanding to the Social Security Administration for further proceedings). The Court will not recite that entire medical history here, as it is voluminous. Instead, it incorporates by reference Judge Mason's recitation of the medical evidence, and summarizes the salient facts as follows.

Ms. Tolbert was 43 years-old at the time this appeal was filed, and claims that she became disabled within the meaning of 42 U.S.C. § 416(i)(1) on April 1, 2005. R. 1. At all times relevant to this case, Ms. Tolbert has been a single mother of three children, the youngest of whom is disabled. A.R. 454-58.[1] She has at all times lived with her children and her grandchild in an apartment in Chicago. *Id.*

Ms. Tolbert completed the 8th grade and part of her first year of high school. *Id*. She does not now, nor has she ever, had a driver's license. *Id*. As an adult, she received vocational and on-the-job training in home care services, landscaping and security work. *Id*. She has not been substantially gainfully employed since April 1, 2005. *Id.* at 157-68.

Ms. Tolbert has maintained that since that date, she has been unable to complete housework due to back and joint pain, unable to stand for more than several minutes at a time, unable to walk more than a half-block without pain and difficulty breathing, and unable to complete even sedentary tasks such as reading or watching a television show without falling asleep. *Id.* at 11-61, 157-68, 444-508.

---

[1] Citations to R. refer to the record number that a document is assigned on the docket for this case. Citations to A.R. refer to the administrative record of these proceedings, which is titled as R. 15 on this docket.

The medical records, including x-rays and other medical imaging reports, support Ms. Tolbert's representations. *See, e.g., id.* at 228-245, 261-271, 293-97, 315, 333-34, 358-360, 372-382, 731-33. Ms. Tolbert has been prescribed a host of medications over time to treat shortness of breath and wheezing, *see id.* at 689 (Albuterol), as well as pain and inflammation, *see, e.g., id.* at 166 (Feloditine, Indapamide, Aspirin, Folic Acid, Cyclobenzaprine to control pain and inflammation), *id.* at 336 (adding Tylenol 3 with codeine). In addition, Ms. Tolbert's longstanding complaints of daytime drowsiness and lack of energy, coupled with an acute cardiac incident in 2008, led her to undergo a sleep study in 2009, which ultimately resulted in a diagnosis of sleep apnea. *Id.* at 280-82; 299-300; 335-57. Ms. Tolbert was prescribed a CPAP machine to treat her symptoms, *id.* at 361-66, however, the daytime drowsiness persists, *see id.* at 317, 461, 802-03. Ms. Tolbert has also consistently reported, and more recently sought treatment for depression. *Id.* at 393-94, 401-09.

## Procedural History

Ms. Tolbert filed the DIB and SSI applications at issue on May 8, 2006, alleging disability beginning April 1, 2005. A.R. 135-42, 157-81. She claimed then, as she has claimed for more than a decade since, that arthritis, diabetes, hypertension, hypothyroidism, sleep apnea, and morbid obesity (weight in excess of 350 pounds, body mass index of greater than 50) prevent her from obtaining gainful employment. *Id.*

Ms. Tolbert's claims were initially denied on August 17, 2006, *id.* at 62-63, 66-80, and again upon request for reconsideration five months later, *id.* at 64-65,

3

81-87 . She appeared unrepresented before the ALJ on March 18, 2009, and again on June 10, 2009 after medical records had been added to her file. *See id.* at 11, 46. On August 31, 2009, the ALJ issued a written decision denying Ms. Tolbert's applications for benefits. *Id.* at 66-76. Central to the ALJ's determination of Ms. Tolbert's claims were his unfavorable assessment of her credibility and rejection of the opinion of her treating physician, Dr. Ahmed. *Id.* at 72-75. Ms. Tolbert requested further review of her case by the Social Security Administration's Appeals Council. *Id.* at 131-34. The Appeals Council denied her request for review, set aside that denial to consider additional medical records, and then denied the request again, rendering the decision final and appealable. *Id.* at 1-10.

As previously noted, Ms. Tolbert then sought judicial review in this district. *Tolbert*, 2012 WL 1245611 at *1. On April 23, 2012, Judge Mason issued a lengthy Memorandum Opinion and Order granting in part and denying in part her motion for summary judgment and remanding the case for further review. *Id.* Specifically, the court found the ALJ's credibility assessment of Ms. Tolbert "unreasonable and not supported by the record," replete with findings contradicted by the medical evidence and based on considerations that were either impermissible under Seventh Circuit precedent or not grounded in common sense. *Id.* at *11-12. In particular, the court took issue with the ALJ's finding that Ms. Tolbert's claims of daytime drowsiness lacked support in the medical record. *Id.* at *12. The Court furthermore cautioned that on remand, "if the ALJ declines to give th[e] opinion [of Dr. Ahmed,

4

Ms. Tolbert's treating physician] controlling weight, he must properly articulate his reasons for doing so." *Id.* at \*12-13.

During the pendency of the first appeal to the district court, Ms. Tolbert filed a second application for DIB and SSI. *See* A.R. 641-48. The reviewing medical consultant opined at that time, based on evidence of chronic hip, lower back and knee pain, degenerative arthritis, and limited range of motion, that Ms. Tolbert's severe impairments equaled listing-level disability 1.02A (*Major dysfunction of a joint(s) due to any cause*). *Id.* at 782-85. She identified the date of onset as November 19, 2009 "based on evidence which shows that claimant weighed 404 lbs. on this date." *Id.* at 784. The Appeals Council reviewed and affirmed the determination. *See id.* at 537-40.

In accordance with Judge Mason's order, the Appeals Council remanded the case to the ALJ for a determination of disability for the period from April 1, 2005, the alleged onset date in Ms. Tolbert's first application for benefits, to November 19, 2009, the onset date identified by the physician who reviewed and approved Ms. Tolbert's second application for benefits. *Id.* Ms. Tolbert re-appeared before the ALJ on December 9, 2013, with the assistance of counsel. *See id.* at 444-508. Her testimony at that hearing was consistent with the testimony she had given a few years earlier, though she reported that the condition of her left knee had become more painful over time. *See id.* at 455-77.

5

**The ALJ's Decision**

On June 26, 2014, the ALJ again denied Ms. Tolbert's claims. *See* A.R. 421-43. Specifically, he found that while Ms. Tolbert had the severe impairments of morbid obesity, osteoarthritis in the knees and lumbar spine, obstructive sleep apnea, insulin dependent diabetes mellitus, and depression from April 1, 2005 through November 18, 2009, these impairments were insufficiently severe to constitute a disability, because Ms. Tolbert had the residual functional capacity ("RFC") to perform restricted sedentary work. *Id.* 427-35. In reaching this conclusion, the ALJ again made adverse credibility determinations as to both Ms. Tolbert and her treating physician, Dr. Ahmed. *See id.* He relied instead on the RFC determinations of three state agency physicians, none of whom considered the impact of Ms. Tolbert's sleep apnea and daytime drowsiness when reaching their conclusions about her ability to perform restricted sedentary work. *See id.* at 433-35. Ms. Tolbert once again appeals, this time seeking summary judgment in her favor on a complete medical record. R. 17.

**Legal Standard**

Judicial review of a final decision of the Social Security Administration is generally deferential. The Social Security Act requires the court to sustain the ALJ's findings if they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court should review the entire administrative record, but must "not

6

reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the [ALJ]." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). "However, this does not mean that [the court] will simply rubber-stamp the [ALJ's] decision without a critical review of the evidence." *Id.* A decision may be reversed if the ALJ's findings "are not supported by substantial evidence or if the ALJ applied an erroneous legal standard." *Id.* In addition, the court will reverse if the ALJ does not "explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). "Although a written evaluation of each piece of evidence or testimony is not required, neither may the ALJ select and discuss only that evidence that favors his ultimate conclusion." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *see Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) ("This 'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence."). Additionally, the ALJ "has a duty to fully develop the record before drawing any conclusions," *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007), and deference in review is lessened when the ALJ has made errors of fact or logic, *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). In oft-quoted words, the Seventh Circuit has said that the ALJ "'must build an accurate and logical bridge from the evidence to his conclusion.'" *Clifford*, 227 F.3d at 872 (quoting *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014)). When the ALJ has satisfied these requirements, the responsibility for deciding whether the claimant is disabled falls on the Social Security Administration, and, if conflicting evidence

would allow reasonable minds to differ as to whether a claimant is disabled, the ALJ's decision must be affirmed. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990) (internal quotation marks and citation omitted).

However, the ALJ's decision need not be affirmed, and "[c]ourts have the statutory power to affirm, reverse, or modify the Social Security Administration's decision, with or without remanding the case for further proceedings." 42 U.S.C. § 405(g). *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011). "This power includes the courts' ability to remand with instructions for the Commissioner to calculate and award benefits to the applicant," and "an award of benefits is appropriate . . . if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for disability benefits." *Id.*

## Discussion

This case is unusual because the Commissioner agrees with the Plaintiff that the ALJ erred in his reaching and articulating his decision. *See* R. 30. Indeed, the Commissioner concedes without reservation that "the ALJ did not adequately explain how Plaintiff's sleep apnea significantly limited her ability to do basic work activities, nor did he explain how the residual functional capacity finding accommodated the limitations stemming from the sleep apnea." R. 30 at 1 n. 2. On that basis, the Commissioner states that "[t]he only issue for the Court is to decide whether to reverse the Commissioner's final decision and remand for further

8

administrative proceedings, or reverse the decision with an order to award benefits." *Id.* at 1. For the following reasons, the Court will do the latter.

1. **The ALJ's credibility determination of Ms. Tolbert is against the manifest weight of the evidence and is not supported by the record.**

The ALJ is given a great amount of deference in his credibility findings. *Getch v. Astrue*, 529 F.3d 473, 483 (7th Cir. 2008). However, when the ALJ's determination is "patently wrong . . . unreasonable or unsupported," it may be overturned. *Id.* In this case, despite finding Ms. Tolbert "generally credible," the ALJ discredited her testimony for three reasons: (1) because she "failed to follow-up on recommendations made by the treating doctor, which suggests that the symptoms may not have been as serious as . . . alleged;" (2) because her "allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty;" and (3) because "even if the claimant's daily activities are truly limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition as opposed to other reasons." A.R. 433-34. The record does not support any of these conclusions.

    A.    <u>Ms. Tolbert's Failure to Follow-up</u>

The ALJ discredited Ms. Tolbert's testimony because she did not pursue diet and exercise with the rigor her physician recommended. A.R. 427, 430-33. Her failure to do so, however, does not logically build to the conclusion reached by the ALJ—that she overstated the seriousness of her symptoms. To the contrary, Ms. Tolbert's explanation that her attempts to exercise were stifled by shortness of breath, body aches, and lack of energy due to poor sleep, actually *supports* her claim

9

for disability. *See, e.g., id.* at 287-360. So, too, do her claims that she lacked motivation to diet due to depression and low energy. *See id.* Far from feeling so well that she opted not to engage in diet and exercise as prescribed, the record establishes that the debilitating nature of Ms. Tolbert's symptoms prevented her from doing so. The contrary conclusion reached by the ALJ is unreasonable.

### B. The Lack of Objective Evidence

The ALJ's bald conclusion that there is insufficient "objective" medical evidence of Ms. Tolbert's condition is puzzling. After all, he thoroughly catalogues years of medical records in determining her residual functional capacity ("RFC"). *See* A.R. 430-33. As set forth above, those records reflect that from 2005 through 2009, Ms. Tolbert had recurring knee and back pain, headaches, swelling in her feet, ankles and legs, shortness of breath, poor sleep, daytime drowsiness, and forgetfulness. *Id.* at 430-32 (citing Exs. 1F, 2F, 4F, 8F, 11F). They establish that during that same timeframe, Ms. Tolbert was prescribed a host of medications for treating pain and inflammation. *Id.* at 431 (citing Exs. 11F). At all relevant times her height was 5'7" and her weight was in excess of 350 pounds. *Id.* at 430 (citing Exs. 1F, 4F, and 11F). The records show that following a sleep study, which Ms. Tolbert undertook on her doctors' recommendation, she was diagnosed with obstructive sleep apnea and prescribed a CPAP machine. *Id.* at 432 (citing Ex. 8F). The records also establish that Ms. Tolbert was diagnosed with and treated for hypertension, hypothyroidism, diabetes, arthritis, and depression. *Id.* at 431 (citing Exs. 4F and 11F); *id.* at 432 (citing Ex. 18F). The Court is unclear how Ms. Tolbert's

10

testimony could find any further support than the pages upon pages of medical reports in the record. The ALJ's inexplicable concern that Ms. Tolbert's limitations are unverifiable is therefore confounding and without basis. It also bears mention that even if this were not the case, the Seventh Circuit has unequivocally held that "the ALJ may not discredit a claimant's testimony solely because there is no objective medical evidence supporting it." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Accordingly, discounting Ms. Tolbert's credibility on the basis that her symptoms could not be verified was erroneous.

### C. "Other Reasons" for Ms. Tolbert's Limitation

Finally, in deciding not to credit Ms. Tolbert's testimony, the ALJ states that there may be "other reasons" unrelated to Ms. Tolbert's medical condition that explain the chronic joint and back pain, shortness of breath, poor sleep, daytime drowsiness and other limiting physical and cognitive symptoms that prevent Ms. Tolbert from working. A.R. 433-34. He does not specify what those "other reasons" might be, leaving a hole in his logic that prevents his credibility determination from being upheld. The Court infers (from nothing more than the general context of his analysis) that the ALJ may consider Ms. Tolbert's weight to be the "other reason" she is not working. But under Seventh Circuit precedent, obesity is a compounding factor when evaluating disability, not a reason to deny benefits. *See Villano*, 556 F.3d at 562 (noting that "a person who is obese and arthritic may experience greater limitations than a person who is only arthritic"). Moreover, it was the critical factor the reviewer of Mrs. Tolbert's second application for benefits cited when she

11

determined that Ms. Tolbert was, in fact, eligible for SSI and DIB as of November 19, 2009. *See* A.R. 782-784 (finding that Mrs. Tolbert's severe impairments equaled listing-level disability 1.02A (*Major dysfunction of a joint(s) due to any cause*) as of November 19, 2009 "based on evidence which shows that claimant weighed 404 lbs. on this date").

The ALJ also comments, almost as an aside, on Ms. Tolbert's "sporadic employment," prior to April 1, 2005. *Id.* at 434. The intended implication of his remark is that Ms. Tolbert's true motive in applying for disability benefits was not actually her medical condition, but rather her inability to find and maintain steady work. But the record shows that Ms. Tolbert was consistently employed from 1998-2005. *See* A.R. 171. It is therefore illogical to conclude from her employment history any ulterior motive or non-medical reason for her claimed inability to work, particularly in light of the overwhelming medical evidence of her physical and cognitive impairments and, as set forth below, the testimony of the administration's vocational experts regarding jobs suitable to her functional limitations.

If there was some other, "other reason" the ALJ was referring to, the Court is at a loss to identify it. There is no basis in the record to question Ms. Tolbert's credibility. The ALJ's conclusion to the contrary lacks foundation and cannot be upheld.

2. **The ALJ's failure to afford controlling weight to Dr. Ahmed as Ms. Tolbert's treating physician was erroneous.**

Dr. Ahmed, Ms. Tolbert's treating physician, opined that Ms. Tolbert's "physical routine is restricted" such that she "will not be able to do routine work."

12

A.R. 264. He based this conclusion on his long-term doctor-patient relationship with Ms. Tolbert, and his view of the aggregate impact of "Hypertension, Arthritis, Chronic Backache, Moderate Obesity, Sleep Apnea, [and] Hypothyroidism," (and the medications required to treat those conditions) on Ms. Tolbert's health. *Id.* "A treating doctor's opinion receives controlling weight if it is 'well-supported' and 'not inconsistent with the other substantial evidence' in the record." *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (quoting 20 CFR § 404.1527(c)(2)). If an ALJ declines to give controlling weight to the claimant's treating physician, he must offer "good reasons" for doing so. *See id.*

On Ms. Tolbert's first appeal, Judge Mason described the reason given by the ALJ to discredit Dr. Ahmed's opinion as "far from good," and instructed the ALJ on remand to "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion," as required by federal regulations. *Tolbert*, 2012 WL 1245611 at *13 (referring to 20 CFR § 404.157(c)(2)). Unfortunately, the ALJ failed to do so.

In his second opinion, despite finding that Dr. Ahmed "regularly saw the claimant," the ALJ rejected Dr. Ahmed's opinion because "[t]he course of treatment pursued by the doctor has not been consistent with one would expect if the claimant were truly disabled." A.R. 434. Specifically, the ALJ would have expected Dr. Ahmed to "order [more] x-rays." *Id.* Along similar lines, the ALJ found it suspicious that Dr. Ahmed "relied quite heavily" on Ms. Tolbert's subjective reports about her

13

symptoms. *See id.* Apparently, the ALJ was concerned that without medical imaging, Dr. Ahmed's diagnosis was merely conjectural. But Dr. Ahmed, a general practitioner who specializes in internal medicine, conducted at least 20 physical examinations of Ms. Tolbert and referred her to specialists for symptoms he lacked the expertise to diagnose or treat himself. *See id.* at 232-45, 372-82. Having regularly spoken to and physically examined Ms. Tolbert, Dr. Ahmed was in an optimal position to assess her credibility and the consistency between her subjective grievances and objective physical state. *See* 20 CFR § 404.1527(c)(2) (explaining that treating physicians "bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations"). After the sleep study Dr. Ahmed recommended for Ms. Tolbert, *see id.* at 385-91, his suspicion that she suffered from sleep apnea was confirmed, and treatment was ordered accordingly, *see id.* at 363-65. What is more, the x-rays ordered by internists at Rush beginning in 2007, after Ms. Tolbert left Dr. Ahmed's primary care, do, in fact, show impairments in Ms. Tolbert's knees and spine. *See id.* at 333-34, 713-714, 795-97. Far from contradicting Dr. Ahmed's medical opinion, the imaging reports in her medical file bolster it. The Court therefore considers his opinion to be entitled to controlling weight. The ALJ's determination to the contrary cannot be sustained.

**3.     The ALJ's RFC determination was erroneous.**

The Commissioner concedes that the ALJ "did not adequately explain how Plaintiff's sleep apnea significantly limited her ability to do basic work activities,

14

nor did he explain how the residual functional capacity finding accommodated the limitations stemming from the sleep apnea. The ALJ also did not adequately address Plaintiff's allegations of falling asleep during the day." R. 30 at 1 n. 2. Still, the Commissioner argues that three "competing opinions" offered by the state agency physicians create an issue of fact that requires further consideration on remand. *Id.* at 4 ("When you have three physicians finding that Plaintiff can do sedentary work and one other physician," Dr. Ahmed, "finding that she cannot, there is a discrepancy to be resolved; the record most assuredly does not support only one conclusion."). Because none of the three physicians the Commissioner references took Ms. Tolbert's sleep apnea into account, the Commissioner is incorrect.

    A.    <u>The agency's reviewing doctors failed to consider Ms. Tolbert's sleep apnea in determining her RFC</u>.

The Court first examines the opinion reached by Dr. Savage, the physician who testified at Ms. Tolbert's administrative hearing based on a review of her medical file. In reaching his conclusion as to Ms. Tolbert's RFC, Dr. Savage considered only the arthritic conditions in her knees and back and her weight. *See* A.R. 484-85. Dr. Savage testified that he considered Ms. Tolbert's hypertension, hypothyroidism and diabetes to be medically controlled and to play no role in her ability to work. *See id.* at 480, 483-84, 487. Though Dr. Savage agreed with the diagnostic report finding that Ms. Tolbert had sleep apnea, *id.* at 491, he did not factor sleep apnea into his RFC determination. When asked why not, Dr. Savage responded that the delay of several months between the date Ms. Tolbert was

15

referred for a sleep study and the time she actually completed it led him to believe that Ms. Tolbert's symptoms of daytime drowsiness were not as severe as she reported. *Id.* at 487. Dr. Savage admitted in response to further questioning that his decision not to consider sleep apnea was not based on medical evidence, but rather on his "thought," "extrapolat[ed] from [Ms. Tolbert's] decision to wait," that if she were as uncomfortable and drowsy as she claimed, she would have undergone a sleep study sooner. *Id.* at 487-91. Of course, since Dr. Savage never examined Ms. Tolbert or spoke with her about her symptoms, *see id.* at 488, his "thought" amounts to little more than conjecture.

The Court has already found that Dr. Ahmed's opinion is entitled to controlling weight and that Ms. Tolbert, who explained that she "didn't go [to the sleep clinic sooner] because of depression," is credible. Dr. Savage's "thought," which contradicts Dr. Ahmed's medical findings and Ms. Tolbert's consistent reports of her subjective symptoms, do not create a fact issue that needs to be weighed. Indeed, because Dr. Savage failed to take Ms. Tolbert's sleep apnea into account in reaching his RFC determination, his opinion has no bearing on the error the Commissioner concedes: that the ALJ "did not adequately address Plaintiff's allegations of falling asleep during the day." R. 30.

Nor do the opinions of the state agency's two reviewing physicians. The first, Dr. Arjmand, does not mention sleep apnea anywhere in his report. *See id.* 253-260. The second, Dr. Bitzer, mentions Ms. Tolbert's sleep apnea as a "secondary diagnosis" and notes that due to "daytime drowsiness, [and] obesity," Ms. Tolbert

16

"[s]hould avoid working at hazardous h[ei]g[h]ts or with hazardous machinery or equipment." *Id.* at 272, 276. He does not otherwise account for her inability to stay awake during work hours or her need for breaks. Thus, neither Dr. Arjmand nor Dr. Bitzer's opinions contradict Dr. Ahmed's, because both failed to adequately consider Ms. Tolbert's daytime drowsiness.

      B.    <u>When sleep apnea and daytime drowsiness are taken into account, the record is unequivocal that Ms. Tolbert is disabled</u>.

To complete its review of the RFC evidence, the Court turns to the testimony of vocational expert Lisa Gagliano, upon whom the ALJ relied heavily in reaching his conclusion. *See* A.R. 436 ("Based on the testimony of the vocational expert, I conclude that . . . [a] finding of 'not disabled' is [ ] appropriate.") During the hearing, the ALJ asked Ms. Gagliano to consider two hypotheticals. The first was as follows:

> Claimant is currently 42 . . . years of age, a younger individual; eighth grade education–that's limited. And she does have past relevant work.
>
> For a hypothetical individual matching that vocational profile first of all, we note the morbid obesity that has been present consistently throughout the entire period and the impact that that could have in terms of aggravating, detrimentally affecting capacities in the presence of other impairments. And other impairments are shown here.
>
> But assume a hypothetical individual matching the claimant's profile and morbid obesity. If that person could occasionally lift and carry 20 pounds, frequently 10—if that person could sit for six of eight hours, standing and walking only two of eight—two hours out of an eight-hour period. That would be intermittently, of course, and 10 minutes straight.
>
> There is a limitation with regard to stairs and ramps; only occasional climbing of short stairs or ramps. No work on ladders, ropes, or scaffolding. No work at unprotected heights or around hazardous moving machinery and only occasional exposure to dangerous conditions, such as open vats or containers that one could fall or stumble into.

17

> Posturally [*sic*], could only occasionally stoop, crouch; no kneeling; no crawling in association with doing any work. But in terms of the weights prescribed here, could frequently balance.
>
> In the presence of pain syndrome, her depressive disorder, and the effects of sleep apnea and/or medications, the individual would be limited to understanding, remembering, and carrying out short and simple instructions but would be able to maintain attention and concentration for extended periods in that type of job function.
>
> This person would be able to perform activities within a schedule, maintaining the punctuality and attendance, and could use judgment and make simple work-related decisions.
>
> This person would be able to complete a normal work day and work week and perform at a consistent pace within this established weight and simple-short-instructions-type work. The individual would be limited to only occasional interaction with the public but could respond appropriately and interact appropriately with coworkers and supervisors. No joint work projects with coworkers, but they could interact within the work setting.
>
> This individual could respond to occasional and routine changes in this work setting, and the individual could frequently travel independently or use public transportation.
>
> For this person, as described, what, if any work, including a consideration of the claimant's past relevant work, could they perform?

*Id*. at 502-03. In response, Ms. Gagliano testified that there would be "no past work available" and "a limited number of jobs that would still be available with that hypothetical situation." *Id.* at 504. The ALJ followed up with a second hypothetical, which, as set forth below, accounts for Mrs. Tolbert's daytime drowsiness secondary to sleep apnea:

> What if the hypothetical person matching the claimant's vocational profile, because of the chronic pain syndrome—there' s evidence of that— depression, lack of motivation, and, perhaps, some degree of fatigue or tiredness[,] *sleep apnea producing some degree of drowsiness and lack of focus*[,] as well as medications side effects, which would enhance, possibly, the effects of drowsiness and attention—would require—would change the mental limitations stated in that this person would only occasionally, because of all of these things, be able to complete a normal work day and

18

> work week and to perform at a consistent pace without an unreasonable number and length of rest breaks . . . If you add those things into the first hypothetical, in terms of making it more severe, what impact would that have on the jobs cited?

*Id.* at 505-06 (emphasis added). Ms. Gagliano responded, unequivocally, "That would eliminate all competitive employment. Those limitations are work preclusive." *Id.* at 506. An identical conclusion was reached by Ms. Kerr, the vocational expert who testified at Ms. Tolbert's first hearing before the ALJ in 2009:

> Q: Now, if this hypothetical is, again, amended to limit sitting to only four of eight hours and stand and walk still at two of eight hours. And we make one other modification, *sleeping due to dozing off one to two hours total in an eight-hour period*. What, if any, work could you find for such an individual so limited?
>
> A: That would preclude all competitive employment.

*Id.* at 43 (emphasis added).

There is no fact issue. When the limiting effects of Ms. Tolbert's sleep apnea are taken into account, the record supports only one conclusion: that Ms. Tolbert is incapable of working.

## Conclusion

For these reasons, the Court remands the case to the Social Security Administration with instructions to calculate and award benefits to the Plaintiff.

19

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: July 18, 2017